50 A.3d 673

JOHN MULLEN AND HOWARD LEVINE, PLAINTIFFS–APPEL-
LANTS, v. THE IPPOLITO CORPORATION, SAMUEL IPPOLI-
TO, PAUL IPPOLITO, ELAINE PETRILLO, IN HER CAPACITY
AS THE ZONING OFFICER OF THE BOROUGH OF POINT
PLEASANT BEACH, THE BOROUGH OF POINT PLEASANT
BEACH, MICHAEL GARDNER, IN HIS CAPACITY AS THE
CONSTRUCTION OFFICER OF THE BOROUGH OF POINT
PLEASANT BEACH, AND MARYANN ELLSWORTH, IN HER
CAPACITY AS THE OFFICIAL IN CHARGE OF ENFORCING
THE BOROUGH OF POINT PLEASANT BEACH'S DUNE ORDI-
NANCES, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued February 16, 2012—Decided September 10, 2012.

Before Judges FUENTES, GRAVES, and KOBLITZ.

*Michael R. Rubino, Jr.* argued the cause for appellants (*Pandolfe, Shaw & Rubino, L.L.C.,* attorneys; *Jeff Thakker,* of counsel; *Mr. Rubino,* on the brief).

*Sean D. Gertner* argued the cause for respondents Borough of Point Pleasant Beach, Elaine Petrillo, Michael Gardner and Maryann Ellsworth (*Gertner Mandel & Peslak, L.L.C.,* attorneys; *Mr. Gertner,* of counsel; *Rachel S. Cotrino,* on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Plaintiffs John Mullen and Howard Levine own a one-family house in an area of the Borough of Point Pleasant Beach that is

zoned exclusively for low density residential use. Plaintiffs' residence is adjacent to the Driftwood Motel, a preexisting nonconforming use in this otherwise residential zone. The Driftwood is owned and operated by defendant Ippolito Corporation, the principals of which are defendants Samuel and Paul Ippolito.

Over the past thirteen years, plaintiffs have complained to municipal officials in Point Pleasant Beach that the Ippolitos were expanding the Driftwood's business operations as well as the property's physical footprint, in violation of: (1) applicable zoning restrictions intended to preserve the residential character of the neighborhood; (2) municipal housing and construction codes; and (3) dune protection ordinances. Plaintiffs allege that municipal officials ignored their numerous complaints and failed to take any corrective or enforcement action against the Ippolitos.

Unable to get relief from the municipality, plaintiffs brought suit in the Superior Court against the Ippolitos, seeking compensatory damages and injunctive relief. Plaintiffs also sought declaratory and *mandamus* relief against the Borough of Point Peasant Beach, Zoning Officer Elaine Petrillo, Construction Official Michael Gardner, and Maryann Ellsworth, the official responsible for enforcing the Borough's dune ordinance (collectively the municipal defendants).

Shortly after joinder of issue, the municipal defendants moved for summary judgment, seeking to dismiss plaintiffs' complaint based on the immunities provided to governmental entities and their employees under the New Jersey Tort Claims Act, *N.J.S.A.* 59:1–1 to 12–3; the time restrictions imposed by *Rule* 4:69–1 on those seeking to challenge municipal action in the Superior Court; and plaintiffs' failure to exhaust administrative remedies under *N.J.S.A.* 40:55D–70, within the time restrictions imposed by *N.J.S.A.* 40:55D–72.

The trial court granted the municipal defendants' motion for summary judgment based on plaintiffs' failure to exhaust administrative remedies as required by *Rule* 4:69–5. The court also found plaintiffs' action untimely under *Rule* 4:69–6(a) because it was

commenced more than forty-five days after the occurrence of the events from which relief was sought. We denied plaintiffs' motion seeking interlocutory review of the trial court's order. On appeal, the Supreme Court reversed our decision and directed us to consider the merits of plaintiffs' arguments. We now take on this charge.

Relying primarily on *Garrou v. Teaneck Tryon Co.*, 11 *N.J.* 294, 94 *A.*2d 332 (1953), plaintiffs argue that the trial court should not have dismissed their complaint against the municipal defendants because they have shown that: (1) there have been clear violations of local zoning and public safety laws, (2) the violations have particularly and adversely affected their right to the quiet enjoyment of their home, and (3) the violations have remained unabated despite having been duly brought to the attention of the relevant municipal officials. After reviewing the record before us, and mindful of the procedural posture of the case, which requires us to view all facts and reasonable inferences therefrom in the light most favorable to plaintiffs, *Rule* 4:46–2(c), we are persuaded by plaintiffs' argument. We reverse the trial court's order dismissing plaintiffs' complaint against the municipal defendants and remand the matter for further proceedings.[1]

I

Plaintiffs purchased their beachfront home in 1998. The Driftwood Motel has operated adjacent to plaintiffs' property "since at least the 1960's." Both properties are located in the SF–5 zoning district, an area permitting only single-family residences, schools operated by the Point Pleasant Beach Board of Education, public

---

[1] Because this appeal concerns only the counts for declaratory and *mandamus* relief against the municipal defendants, we do not express any opinion as to the merits of plaintiffs' claims against the Ippolitos. According to plaintiffs, while this case was pending before the Supreme Court, the trial court granted in part and denied in part the Ippolitos' motion for summary judgment. Plaintiffs are not seeking review of this decision as part of this appeal.

playgrounds, parks, and "other public purpose uses." Borough Ordinance 19–9.1 delineates other permitted non-residential uses:

a. *Principal Permitted Uses on Land and in Buildings.*

. . . .

4. Notwithstanding any other provision of this chapter, no building or structure shall be permitted on the beaches or boardwalk in the areas east of the boardwalk or boardwalk line as described on the zoning map, with the following exceptions:

(a) Participatory recreational activities, including swimming, bathing beaches and other similar recreational activities which will preserve the natural condition of these lands between the hours of 7:00 a.m. and 10:00 p.m., so long as adequate life guards, life saving apparatus and other necessary facilities are provided and the use meets the licensing requirements of the borough;

(b) Temporary structures to house beach umbrellas and other equipment appurtenant to the principal use;

(c) One unlighted attached or free standing sign, not to exceed 15 square feet, identifying the beach, its operating hours and rules and regulations.

5. Two-family dwellings only in that portion of the SF–5 zone east of Ocean Avenue and south of Carter Avenue, extending not more than 110 feet from Carter Avenue and not within 100 feet of the boardwalk right-of-way.

b. *Accessory Uses Permitted.*

1. Private residential swimming pools (see subsection 19–11.11 for standards).

2. Private residential utility sheds (see subsection 19–11.1a. for standards).

3. Off-street parking and private garages for storage of a maxi-mum of three vehicles. The garage shall not exceed 16 feet in height.

4. Fences and walls (see subsection 1911.4).

The Driftwood Motel existed on its present site before the Borough adopted these zoning restrictions, and is therefore considered a preexisting nonconforming use under *N.J.S.A.* 40:55D–68.

The Driftwood was partially destroyed in 1977; it was rebuilt thereafter with the knowledge and approval of the Borough's Zoning Board of Adjustment (Board). As part of the rebuilding, the motel expanded the third story of the fire-damaged building. Although this expansion was initially attempted without the Board's knowledge, municipal construction officials quickly discovered it and halted construction pending formal approval by the Board. The Board eventually granted the motel a variance for the expansion of the third story to accommodate *"one living unit."* (Emphasis added). Despite this express limitation, the Board

characterized the outcome as "a substantial enlargement of the nonconforming use."

Plaintiffs maintain, however, that the Ippolitos did not submit a specific site plan at the time the Board voted to approve the expansion of the third story. According to plaintiffs, the absence of a site plan has permitted the Ippolitos to unlawfully expand and intensify the business activities of the motel, without complying with the relevant zoning restrictions. Plaintiffs are particularly concerned about the erosion and, in some areas, the outright destruction of the motel's sand dunes, a vital barrier that constitutes the first line of defense against coastal storms.

At present, the motel consists of two separate buildings erected on a lot measuring 100 feet by 250 feet, for a total of 25,000 square feet. The buildings house thirty-five rooms and have a number of amenities, including an in-ground pool, a concrete patio, a snack bar, lavatory and shower facilities for non-motel guests using the beach, and parking spaces to accommodate the motel's guests. According to plaintiffs, the motel is overdeveloped given the size of its property.

Plaintiffs emphasize that living next door to the motel has given them a unique and clear vantage point from which they have detected the systematic, covert expansion of the motel's business activities, all to the detriment of their quality of life and right to the quiet enjoyment of their home. Plaintiffs have identified the following areas of concern.

### Snack Bar

The first of these alleged unlawful expansions involved the snack bar, which is located at the rear of the motel. In a certification submitted in opposition to the municipal defendants' summary judgment motion, Mullen averred:

> In 1999, I observed that a snack bar servicing the "Driftwood" was being enlarged so that is [sic] double in size. I contacted the Borough of Point Pleasant Beach's

then—Code Enforcement/Zoning Official [2] (Robert Evans) and was told that the motel operators had obtained a "permit" (it was actually to renovate—not to expand—the snack bar). The doubling in size of the snack bar expands and intensifies the Driftwood. Noises and smells from the snack bar carry over into our property. Non-motel guests now use the snack bar.

[ (Footnote omitted).]

Plaintiffs retained Phillip R. Kavanaugh, a licensed professional engineer, "to review the history of expansion modification and intensification of the hotel as they relate to the requirements of the Borough's Land Development Ordinance particularly with respect to Zoning." Kavanaugh outlined and discussed his findings in a report dated October 28, 2010.

Kavanaugh reviewed three surveys depicting the lot where the motel has sat over a period of twenty-five years. The first survey is dated October 3, 1985; the second, updated version of the survey is dated January 10, 1989; and the third survey, which was commissioned by plaintiffs in connection with this litigation, is dated October 12, 2010. Kavanaugh also personally inspected the motel property to verify and confirm the data contained in the surveys. Based on the surveys and his personal observations, Kavanaugh found that the snack bar area had increased in size from 122.4 square feet to 186.9 square feet between 1985 and 2010, a total increase of 64.5 square feet. Kavanaugh also found a series of corresponding modifications, including the placement of "Trex [3] steps and walk area, a retaining wall, and a concrete walk area in front of and adjacent to the relocated and enlarged snack bar."

In Kavanaugh's opinion, these modifications "would require additional variance relief and site plan approval from the Zoning

---

2 In a footnote to his certification Mullen indicated that he had made similar complaints to construction code enforcement officer Gardner and zoning enforcement officer Petrillo.

3 "Trex" refers to the trade name for a manufacturer of concrete-alternative wood steps and decking.

Board of Adjustment and a CAFRA[4] permit from the State of New Jersey Department of Environmental Protection." Pursuant to Borough Ordinance 19–14.2:

> b. *Site Plan Approval.* Except as hereinafter provided, no construction permit shall be issued for any structure or use until a site plan has been reviewed and approved by the appropriate board, except that a subdivision or individual lot application for detached one or two dwelling unit buildings and their accessory building(s) shall not require site plan approval. For development meeting the most current definition of "major development" pursuant to the Stormwater Management Rules, now codified at *N.J.A.C.* 7:8 et seq., non-structural stormwater strategies shall be incorporated into the design, per Chapter 2 of the Best Management Practices (BMP) Manual.
>
> 1. Site plan approval for expanded use. The provisions of paragraph b. (Site Plan Approval) above shall apply to any use which is being expanded as well as to any building or structure as provided for above. This means that if any applicant that would normally be subject to site plan approval in the event of expanding the physical structure or building expands his or her business use without modifying the structure, they shall be subject to the provisions and site plan requirements of the within ordinance.

Borough records show only one construction permit issued to the motel on September 16, 1999, describing the work to be performed at the snack bar as: "Alterations/change Windows With Smaller One 2x4 With New And Sheet Rock And Counter Tops and Railroad Ties." In a certification submitted in support of the municipal defendants' motion for summary judgment, Petrillo, the Borough's Code Enforcement/Zoning Officer, averred that "[t]hrough the normal course and procedure, the Borough officials determined that the permit was sufficient to approve the snack bar facilities and no further plans were required. *The Borough determined there was no expansion in use and the alterations did not warrant Zoning Board approval.*" (Emphasis added). Petrillo did not clarify this general reference to "Borough" by identifying any particular individual or municipal agency that acted on behalf of the municipality in this instance.

### Boardwalk

Plaintiffs also claim that the municipal defendants ignored their repeated complaints concerning the Driftwood's unlawful expan-

---

4 Coastal Area Facility Review Act, *N.J.S.A.* 13:19–1 to –21.

sion of its impervious surface area by replacing the wood plank boardwalk with a concrete patio. According to the surveyor who examined and compared the data, the 1989 survey showed that the percentage of total impervious lot coverage was 75.9%. By contrast, the survey completed in 2010 showed the percentage of total impervious lot coverage as 85.92%. Coupled with the destruction of the motel's sand dunes, plaintiffs claim that this unlawful expansion of impervious space has significantly increased the risk of flooding.

Kavanaugh addressed this problem in his October 28, 2010 report. According to Kavanaugh, Borough records showed a February 19, 2002 permit issued to the Driftwood to "[r]eplace [b]oardwalk [d]ecking." The permit did not authorize the substitution of impervious concrete for traditional wood plank decking. After comparing the 1989 survey with the 2010 survey, Kavanaugh opined that the area covered by concrete after completion of the "replacement" work exceeded the area previously covered by wood planks.

In addition to the environmental concerns, Kavanaugh also found the substitution of concrete for wood had legal implications.
The 2002 permit gives approval to replace the existing wooded boardwalk decking. It did not give approval to remove the timber boardwalk decking and decking support structure and replace it with concrete pavement. The replacement of wood timber decking with concrete and extension of the limits of the concrete beyond the limits of the original boardwalk results in an increase in impervious coverage and as such requires site plan approval and CAFRA approval. Upon noting the replacement of the wood boardwalk with the stamped concrete, the Borough officials should have required Driftwood Motel to obtain the necessary approvals.

The Borough's official response to this issue mirrored the one it gave with respect to the snack bar. Despite empirical evidence showing the expansion of the motel's impervious area, the zoning officer certified that "the Borough" could not determine the work had exceeded permissible coverage because the survey had not been provided at the time the permit was issued. Kavanaugh opined that no reasonable zoning officer could have concluded that a violation had not occurred.

### Increased Number of Motel Rooms

Plaintiffs submitted the deposition testimony of a neighbor, Paul Buletza, who, in the 1970's, witnessed the motel replace its restaurant facility with additional motel guestrooms. If Buletza's testimony is deemed credible at trial, it would constitute a violation of local zoning restrictions. As noted earlier herein, the only variance granted by the Borough's board of adjustment occurred in 1977, and pertained to the rebuilding of the motel's fire-damaged third floor. The variance authorized the motel to increase the third floor by adding only one motel room. The municipal defendants did not take any action to investigate Buletza's claims.

### Outdoor Restrooms and Changing Facilities

The 2010 survey of the motel property depicts outdoor restrooms; these facilities were not depicted in the two earlier surveys from 1989 and 1985. Plaintiffs have also averred that these outdoor facilities did not exist at the time they purchased their home in 1998. These restrooms and changing rooms are not restricted to registered motel guests; they are also available to individuals renting access to the beach area and/or patronizing the snack bar. Mullen certified that people who use these facilities have knocked on his door asking to borrow toilet paper when the restrooms' supply has run out and an employee from the Driftwood is not available.

There is no record of a permit being requested by or issued to the Driftwood in connection with these facilities at any time between 1985 and 2010. There is also no record that the Driftwood applied to, or received approval from, the zoning Board to construct these facilities. Plaintiffs have complained to municipal officials about these alleged "illegal facilities" and unauthorized expansion by the Driftwood to no avail.

### Parking

Plaintiffs submitted a "Parking Analysis Report" of the Driftwood Motel property prepared by Ray Carpenter, a licensed professional engineer with R.C. Associates Consulting, Inc. Car-

penter· reviewed "historical aerial photography . . . to determine the history of the parking lot at the site." Using an aerial photograph of the property taken in 1978, Carpenter established that the "overall dimensions of the parking lot have not changed to date[,] however no stall delineation/stripping was evident." The earliest evidence showing designated spaces in the motel's parking lot is a 1988 aerial photograph depicting twenty-eight delineated parking spaces. Carpenter visited the motel parking lot on July 26, 2010 and counted thirty-three passenger vehicles parked at the site.

After reviewing the Borough's parking ordinance, Carpenter opined the Driftwood had to provide 1.25 parking spaces for each rental room. Because the motel has thirty-five rooms, it is required to provide forty-four parking spaces. The existing thirty-three spaces are, therefore, insufficient as a matter of law. Another Borough ordinance prohibits parking within five feet of the property line. Carpenter found the north, west and south sides of the motel's parking lot violated that restriction. The parking lot also lacks the curbing required by municipal ordinance, at times causing drivers to jump the curb in an effort to exit the lot. Finally, Carpenter opined[5] that the motel had recently changed the configuration of the parking lot without securing site plan approval from the Borough's board of adjustment.

Plaintiffs certified that the motel's parking deficiencies have undermined their quality of life and interfered with the quiet enjoyment of their home. Cars are unable to negotiate the parking lot's inner passageways, resulting in driver frustration, usually manifested by loud voices and car horns. The municipal defendants have not responded to plaintiffs' repeated complaints seeking enforcement of the local ordinances.

---

[5] Carpenter based his opinion on a physical inspection of the parking lot and by comparing the size of a current planter located on the lot with the planter depicted in the 1989 survey.

## Expansion of Motel

The Kavanaugh report also addressed the expansion of the motel's deck and pool area by comparing the motel's footprint, as depicted in 1985 survey, with the footprint showed in the 1989 survey. According to Kavanaugh, during this period of time the pool was reconstructed, reshaped, and enlarged.

Kavanaugh found additional evidence of expansion when he inspected the motel property on October 8, 2010. After reviewing the survey conducted in 2010, Kavanaugh concluded that "the fence and boardwalk around the pool were extended to encroach further into the Borough's Boardwalk Right–of–Way." Mullen certified that Borough records did not have any permits authorizing these expansions. In Kavanaugh's opinion, the expansion of the pool and the wood deck servicing it constitutes an intensification of the preexisting nonconforming use, requiring variance relief from the Borough's board of adjustment and a "CAFRA Permit" from the State's Department of Environmental Protection.

## The Dunes [6]

Plaintiffs argue that despite the existence of a dune ordinance, the Borough does not have a mechanism to enforce it. Plaintiffs' engineering expert Ray Carpenter addressed the issue of dune maintenance in the certification he submitted in opposition to the municipal defendants' summary judgment motion. Carpenter averred that he observed motel employees allowing "unlimited access to the beach through the dunes," in violation of CAFRA regulation *N.J.A.C.* 7:7E–3.16(b)(3) and section 21–2.3(c) of the Borough's dune ordinance. The motel also has not installed fencing to protect the dune, in violation of CAFRA regulation,

---

[6] CAFRA regulation *N.J.A.C.* 7:7E–3.16(a)(1) defines a "dune" as "a wind or wave deposited or man-made formation of sand (mound or ridge), that lies generally parallel to, and landward of, the beach and the foot of the most inland dune slope. 'Dune' includes the foredune, secondary or tertiary dune ridges and mounds, and all landward dune ridges and mounds, as well as man-made dunes, where they exist."

*N.J.A.C.* 7:7E–3.16(b)(5), and municipal ordinance Section 21–2.3(h), and has permitted its dune to be used as a beach.

According to Carpenter, although the Borough is required to enforce its dune protection ordinance, the dune inspector is not equipped to do so. Plaintiffs cite the following deposition testimony of the Borough's Dune Inspector, Richard Ritchings, in support of their position.

Q. As the dune inspector, who actually appoints you as dune inspector?

A. Appointed by the mayor and I'm not sure if it's a council-backed appointment also. I know it's a mayoral appointment. I don't know if it's mayor or council.

Q. Is it by resolution, do you know?

A. Yes.

Q. There's also—I read in some of the paperwork that you sent over, some of the ordinances. A dune consultant, do you know what that capacity, that position is supposed to be?

A. My understanding of dune consultant would be a consultant hired by the township and a primary responsibility of the dune consultant maybe to establish a dune reference line or dune limit throughout the Borough of Point Pleasant Beach.

Q. Getting back to your position as the dune inspector, do you have any official job description as to what you're supposed to do?

A. My understanding is simply to provide another set of eyes, if you will. What I do in this role is anything from again, public outreach and education. We're trying to develop, perhaps, volunteer dune planting efforts, but at the same time, part of the reason I volunteered for the position is I'm often on the beach and often walk the beaches. And I'm just asked to keep my eye out for potential violations.

Q. If you do see a violation what, if anything, are you supposed to do?

A. What I do, if I see a violation, is I'll report to Elaine Petrillo, the code official in town. Some of my communications as dune inspector have also been directed to the mayor and council as well.

Q. For what reason would you communicate directly with the mayor and council?

A. Again, just on a matter of apparent—

Q. I'm talking in your capacity as dune inspector.

A. Dune inspector, sure. Again, just advising them on a matter of potential violation, or just a summary report of an inspection or inspections.

Q. So, you're not employed by the town?

A. No.

Q. And this is more or less a volunteer position?

A. Yes.

Q. And you're not expected to follow any regular schedule to go down there and do any inspections as to when you're supposed to do it. Do you have any reporting procedure?

A. No.

Carpenter opined that the Borough's failure to protect the dunes have left plaintiffs vulnerable to coastal flooding. Plaintiffs maintain that they have repeatedly complained to municipal officials about the depleted state of the dunes without result. Plaintiffs cite to an event that occurred on September 19, 2009, in which Driftwood employees re-graded the motel's dunes, in direct violation of the municipal dune protection ordinance, merely to accommodate a wedding. Plaintiff Mullen videotaped the event for evidentiary purposes. The Borough did not take any enforcement action against the Driftwood. Carpenter opined that no reasonable dune inspector would fail to notice this violation.

These dune protection problems continued even after plaintiffs commenced this action in the Superior Court. Plaintiffs sought emergent relief in the form of an order to show cause after the motel began to offer "Zumba" exercise classes on top of the dunes to several non-registered guests. The classes quickly ended after the Borough issued a "notice to cease" against the Driftwood. Plaintiffs note, however, that municipal action occurred only after they sought emergent relief from the court.

## II

Citing *Rule* 4:69–5, the trial court grounded its decision to dismiss the *mandamus* relief sought against the municipal defendants based on plaintiffs' failure to exhaust administrative remedies. Specifically, the court held that "plaintiffs were required to appeal the enforcement officers' decisions, namely, that they disagreed with plaintiffs' interpretation of the applicable Ordinance before seeking *mandamus* from this court." The court also found plaintiffs' action untimely under *Rule* 4:69–6 and, by so doing, rejected plaintiffs' argument that strict adherence to the *Rule's* time requirements under these circumstances would be against the interest of justice.

This court disagrees that it is in the interest of justice to allow plaintiffs to challenge decisions made by moving [municipal] defendants many years ago.

Plaintiffs admit that they witnessed the allegedly unlawful expansion of the snack bar in 1999, the decking in 2002, the replacement of boardwalk decking in 2004, and the installation of outdoor bathrooms about seven years ago. The proper time to address such improper permits and/or failure of the Borough to stop such expansions was within 45 days, per *Rule* 4:69-6. The fact that plaintiffs complained to the Zoning Officers and the Zoning Officers did not agree with them with regard to alleged violations does not preserve their right to seek *mandamus* under the Rules.

The trial court found plaintiffs' reliance on *Garrou, supra,* 11 *N.J.* 294, 94 *A.*2d 332, misplaced, emphasizing that the Supreme Court in that case held that the remedy of *mandamus* should be denied if "there is other adequate relief available." *Id.* at 302, 94 *A.*2d 332. In the trial court's view, denial of *mandamus* relief was warranted because plaintiffs could have appealed the zoning officer's decision to the zoning board of adjustment. The trial court also rejected plaintiffs' argument that the Court in *Garrou* fashioned an equitable remedy exempt from the time restrictions governing actions in lieu of prerogative writs.

### III

Because plaintiffs have predicated their cause of action on *Garrou,* we begin our analysis with a careful review of the facts the Court faced in that case and the principles it derived from them. The plaintiff in *Garrou* owned a single-family house in Teaneck. *Id.* at 296, 94 *A.*2d 332. One of the defendants owned a track of land composed of six lots, five of which were located within a business zone; the sixth lot was within a Class A residential zone and adjacent to the plaintiff's home. *Ibid.*

In 1950, the defendant announced its plan "to erect a shopping center with parking facility on its tract and that the defendant The Great Atlantic & Pacific Tea Company [A & P] would occupy a portion thereof." *Ibid.* In July 1950, the plaintiff's attorney wrote a letter to the Teaneck Municipal Manager concerning "the proposed construction," expressing his opinion that the parking facility was not within the business zone. *Id.* at 296-97, 94 *A.*2d 332. The plaintiff's attorney wrote a similar letter one month later to the owner of the track of land upon which the A & P planned to

erect its store and parking facility. *Id.* at 297, 94 *A.*2d 332. This letter warned the defendant that the proposed parking lot "would violate the zoning ordinance and would result in legal proceedings." *Ibid.*

The defendant landowner was not deterred by the attorney's admonition. The defendant applied for a building permit to construct the A & P, including the parking facility, as originally intended "in accordance with plans and specifications." *Ibid.* The municipality approved the application, construction began shortly thereafter, and the project was completed in April 1951. *Ibid.* The municipal Superintendent of Buildings thereafter issued a certificate of occupancy to the building for the purpose of housing "stores." *Ibid.*

By the time the case reached the Supreme Court, the building was occupied by the A & P "and other tenants." *Ibid.* The abutting land, including the lot adjacent to the plaintiff's home, was paved and used for parking. *Ibid.* On "April 19, 1951, the plaintiff's attorney wrote a second letter to the municipal manager complaining about the proposed use of the parking lot in the residential zone. A reply dated April 23, 1951 notified him that the matter would be discussed with the township attorney and he would be advised." *Ibid.* Despite this assurance, the municipality did not take any further action. *Ibid.*

In the face of municipal inaction, the plaintiff in *Garrou* filed a complaint in the Superior Court alleging the use of lot six for parking purposes violated the municipal zoning ordinance and had "caused disturbance, annoyance and discomfort to him and members of his family and had greatly depreciated the value of his property for residential purposes." *Ibid.* The plaintiff sought compensatory damages from the "private defendants" and an injunction restraining them from using lot six as a parking facility. *Id.* at 297–98, 94 *A.*2d 332. The plaintiff also asked the court to compel "the defendant municipal officials to enforce the zoning ordinance against" the landowner and its tenant A & P, and to modify and amend "the certificate of occupancy to permit only the

portion of the premises within the business zone to be used for business purposes." *Id.* at 298, 94 *A.*2d 332.

On these facts, the matter proceeded to trial. At the end of the plaintiff's case, the court granted the defendants' motion to dismiss. With respect to the counts seeking an order from the court directing the municipal officials to enforce the ordinance against the private defendants, the trial court held "that the sole remedy for their failure to perform their public duty was by indictment." *Id.* at 301, 94 *A.*2d 332.

The Supreme Court [7] characterized the plaintiff's cause of action against the municipal officials as invoking "the procedure in lieu of prerogative writs, in this instance *mandamus* . . . ." *Id.* at 301, 94 *A.*2d 332. In rejecting the municipal officials' argument against this form of relief, the Court noted that the prerogative writ has been historically used in our State "as a comprehensive safeguard against official wrong." *Id.* at 302, 94 *A.*2d 332. This cause of action empowers the private citizen to institute civil proceedings "to correct public misdoing and compel performance of public duty." *Ibid.*

 As is the case with all equitable remedies, the court must exercise its discretionary authority to issue a writ of *mandamus* carefully, in furtherance of essential justice, and "subject to important and well-defined qualifications." *Ibid.* Toward that end, both the plaintiff's right to the relief requested and the defendant's duty to perform it must "legally be clear." *Ibid. Mandamus* relief "must be denied where equity or paramount public interest so dictates or *there is other adequate relief available.*" *Ibid.* (emphasis added). As to this latter point, the Court emphasized that the "relief must realistically be adequate and the theoretical possibility of indictment of the public official is no barrier to *mandamus.*" *Id.* at 303, 94 *A.*2d 332.

---

[7] On its motion, the Supreme Court bypassed the Appellate Division and granted direct certification of the trial court's decision. *Id.* at 296, 94 *A.*2d 332.

The Court also recognized the built-in practical safeguards against the possible abuse of such power. Quoting Justice Dixon in *Ferry v. Williams,* 41 *N.J.L.* 332, 338 (Sup.Ct.1879), the *Garrou* Court noted:

> The general indifference of private individuals to public omissions and encroachments, the fear of expense in unsuccessful and even in successful litigation, and the discretion of the court, have been, and doubtless will continue to be, a sufficient guard to these public officials against too numerous and unreasonable attacks.
>
> [*Garrou, supra,* 11 *N.J.* at 302, 94 *A.*2d 332.]

After surveying and discussing the cases that have used *mandamus* "to command the performance of a public duty which ought to be performed," the Court distilled the following core prerequisites that must be established by those seeking *mandamus* relief in this area: (1) a showing that there has been a clear violation of a zoning ordinance that has especially affected the plaintiff; (2) a failure of appropriate action despite the matter having been duly and sufficiently brought to the attention of the supervising official charged with the public duty of executing the ordinance; and (3) the unavailability of other adequate and realistic forms of relief. *Id.* at 302–04, 94 *A.*2d 332. Applying these principles to the facts developed at trial in *Garrou,* the Court found the plaintiff had made a sufficient "showing at the end of his case ... to withstand the motion to dismiss grounded on the alleged absolute unavailability of any proceeding in lieu of prerogative writ to compel enforcement of the ordinance." *Id.* at 304, 94 *A.*2d 332.

We reach a similar conclusion here. Plaintiffs presented concrete evidence establishing a pattern of indifference by the municipal officials charged with the enforcement of the local zoning and beach protection ordinances. The evidence, viewed in the light most favorable to plaintiffs, show plaintiffs repeatedly complained to these officials that the Driftwood was expanding and intensifying its business activities in defiance of municipal zoning ordinances. Plaintiffs' actions in this respect are similar to the letters written by the plaintiff's attorney in *Garrou.* Like *Garrou,* plaintiffs were either ignored or told, in a summary and

dismissive fashion, that enforcement action against the Driftwood was unwarranted.

### Exhaustion of Administrative Remedies

■ The trial court nevertheless concluded that the Court's holding in *Garrou* does not dismantle or supplant our modern rules governing actions in lieu of prerogative writs. We agree. We do not agree, however, that our modern rules governing actions in lieu of prerogative writs implicitly overruled the principles set out in *Garrou*. The Court's holding in *Garrou* was grounded on a profound appreciation of a citizen's right to seek the enforcement of laws, when violations of these laws have gone unaddressed by those responsible for their enforcement over an extended period of time. In those rare cases, judicial intervention is warranted only when: (1) the party seeking relief shows there has been a clear violation of a municipal ordinance that has especially affected him or her; (2) appropriate municipal action was not taken despite the matter having been duly and sufficiently brought to the attention of the supervising official charged with the public duty of enforcing the ordinance; and (3) the party seeking judicial relief shows the unavailability of an adequate, realistic alternative form of relief. *See id.* at 302–04, 94 *A.*2d 332.

■ Applying these standards here, plaintiffs have presented sufficient evidence that their complaints to the municipal zoning and construction code officials were intended to trigger some kind of response or formal investigation. Plaintiffs identified areas of concern with respect to the motel's business activities and requested that corrective action be taken. Over the years, plaintiffs saw these alleged unlawful activities continue unabated, to the detriment of their right to the quiet enjoyment of their home.

Based on the evidence reviewed by plaintiffs' experts, it appears that the motel's alleged unlawful expansion and commensurate intensification of its business activities occurred gradually over time. It can be reasonably inferred that the motel performed the work necessary to bring about this expansion surreptitiously,

because municipal zoning and construction records do not contain any evidence of compliance with relevant zoning ordinances. As a practical matter, plaintiffs were able to discover these alleged expansions only after they were completed. Their complaints to the municipal defendants thereafter met with either negligent indifference or willful disregard.

*N.J.S.A.* 40:55D–70(a) authorizes municipal zoning boards of adjustment to "[h]ear and decide appeals where it is alleged by the appellant that there is error in any order, requirement, decision or refusal made by an administrative officer based on or made in the enforcement of the zoning ordinance." Accordingly, *N.J.S.A.* 40:55D–72(a) requires "any interested party affected by any *decision* of an administrative officer of the municipality based on or made in the enforcement of the zoning ordinance or official map" to file an appeal to the board "within 20 days by filing a notice of appeal with the officer from whom the appeal is taken specifying the grounds of such appeal." (Emphasis added).

█ In most circumstances, "a cause of action is deemed to accrue when facts exist which authorize one party to maintain an action against another." *Marini v. Wanaque,* 37 *N.J.Super.* 32, 38, 116 *A.*2d 813 (App.Div.1955). Under *N.J.S.A.* 40:55D–72(a), however, the interested party's right to seek appellate review does not accrue until the administrative officer *makes a decision.* Likewise, *N.J.S.A.* 40:55D–70(a) limits a board's appellate jurisdiction to review "any order, requirement, decision or refusal made by an administrative officer." Both statutes envision an administrative officer who is acting in some discrete and ascertainable fashion, putting the interested party on notice that his or her right to seek administrative review has accrued.

Here, plaintiffs' cause of action is grounded on the municipal defendants' failure to respond to or act upon their numerous complaints of alleged zoning violations by the Driftwood. If true, these allegations describe an amorphous history of municipal inaction, rendering plaintiffs without a realistic alternative form of administrative relief.

This is especially true with respect to the complaints involving the sand dunes. The deposition testimony of the municipal official charged with enforcing the dune protection ordinance clearly revealed a pattern of non-enforcement. Based on his deposition testimony, the dune protection officer functions merely as a beach-watcher, operating on an ad hoc basis, volunteering his time to walk about the beach, reporting what he sees without any expectation of an official follow-up enforcement effort. The dune protection ordinance does not contain a procedure for appeals. Absent this *mandamus* action, local property owners like plaintiffs are left without recourse to protect their properties in the face of municipal indifference to this vital coastal concern.

### Time Restrictions

■ Under *Rule* 4:69–6(c), a court may enlarge the time restrictions in *Rule* 4:69–6(a) "where it is manifest that the interest of justice so requires." We are satisfied that the facts of this case warrant a relaxation of the time restrictions governing actions in lieu of prerogative writs.

Our Supreme Court has recognized that cases "involving: (1) important and novel constitutional questions; (2) informal or *ex parte* determinations of legal questions by administrative officials; and (3) important public rather than private interests which require adjudication or clarification" have satisfied the "interest of justice" standard in *Rule* 4:69–6(c). *Borough of Princeton v. Bd. of Chosen Freeholders*, 169 *N.J.* 135, 152, 777 *A.*2d 19 (2001). More recently in *Hopewell Valley Citizens' Grp., Inc. v. Berwind Prop. Grp. Dev. Co., L.P.*, 204 *N.J.* 569, 584, 10 *A.*3d 211 (2011), the Court acknowledged, however, "that there may be circumstances that warrant an enlargement of time [under *Rule* 4:69–6(c) ] other than the traditional categories."

In our view, the facts here raise questions concerning both the vindication of plaintiffs' private property rights and the important public interest in ensuring that public officials perform their official duties diligently and with reasonable dispatch. Specifically with respect to the dune protection ordinance, the citizens of Point

Pleasant Beach are entitled to know if their public officials are doing all that is legally required to protect this vital public resource. *Cohen v. Thoft,* 368 *N.J.Super.* 338, 345–47, 845 *A.*2d 1281 (App.Div.2004).

## IV

The trial court's order granting the municipal defendants' motion for summary judgment is reversed and the matter remanded for such further proceedings as may be warranted. We do not retain jurisdiction.